IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HIGHTOWER HOLDING, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>DARREN REINIG,<br><br>    Defendant. | Civil Action No. 24-CV-323-RGA |

MEMORANDUM ORDER

Before me is Reinig's Motion to Dismiss for Failure to State a Claim and/or for a More Definite Statement. (D.I. 26). Reinig's Motion to Dismiss concerns the enforceability of the non-compete agreement whose alleged breach forms one basis for this action. Reinig's Motion for a More Definite Statement concerns Hightower's claim for breach of the Defend Trade Secrets Act, the other basis for this action. I have considered the parties' briefing. (D.I. 27, 33 (Reinig's briefs); D.I. 32 (Hightower's brief)). For the reasons set forth below, Reinig's motion is GRANTED IN PART and DENIED IN PART.

I. BACKGROUND[1]

Hightower is an investment advisory and wealth management firm that operates across the country. (D.I. 1 ¶ 13). Reinig is an investment advisor. (*Id.* ¶ 1). From July of 2019 to May of 2023, the parties executed a series of agreements. In the first agreement, executed in July of 2019, Hightower purchased "materially all of the assets" (*id.* ¶ 18) of Delphi, an investment advisory

---

[1] The Court has federal question jurisdiction over Hightower's DTSA claim and supplemental jurisdiction over Hightower's state law claims. (D.I. 1 ¶ 11). The Court states the factual allegations in the light most favorable to Hightower.

1

business of which Reinig was a 50% owner and member (*id.* ¶ 2), and merged it with another company, Lourd, into a newly formed business operating under the name "LourdMurray." (*Id.* ¶¶ 2, 18). Hightower and Reinig were both members of LMDP, the company managing and operating LourdMurray. (*Id.* ¶ 18). One of the terms of the Initial Acquisition required that Reinig execute another agreement, the "Standard Protective Agreement" (*id.* ¶ 6) ("SPA"), "which provides for post-sale restrictions [against Reinig] on competition, solicitation, and use of confidential information, among other things." (*Id.*).

From July of 2019 to December of 2021, Reinig provided investment advice and financial services through Hightower. (*Id.* ¶¶ 21–23). In December of 2021, Reinig sold his interest in LMDP to Hightower (*id.* ¶ 23), and he assisted Hightower in transitioning his clients to other Hightower advisors affiliated with LourdMurray until the end of 2022, when his relationship with Hightower ended. (*Id.* ¶¶ 25–26).

In May of 2023, Reinig and Hightower executed a "Letter Agreement" modifying the terms of the SPA to make way for "Reinig's expressed intent to pursue business and investment opportunities in the field of venture capital and private equity, which (Reinig stated) would not interfere with Hightower's client relationships." (*Id.* ¶ 27).

Hightower now alleges that Reinig has breached the covenants to which Reinig agreed in the SPA. Specifically, Hightower alleges that in February of 2024, Reinig started a new "wealth management and investment advisory business in southern California called Torren Management, LLC [] with his partner Todd Hyatt[.]" (*Id.* ¶ 42). Hightower also alleges that Reinig has leveraged Hightower's "confidential, proprietary, and trade secret information" to solicit Hightower clients. (*Id.* ¶ 45). Reinig moves to dismiss for failure to state a claim under Rule 12(b)(6) and moves for a more definite statement under Rule 12(e). (D.I. 26).

## II. LEGAL STANDARD

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

## III. DISCUSSION

### A. The Non-Compete Provision is Void Under California Law.

Reinig moves to dismiss Counts I, III, IV, and VI. (D.I. 26 at 2). The parties' primary dispute concerns the validity of the non-compete provision of the SPA. Because the SPA violates

the public policy of the default state, California, it is invalid under California law. Thus, it cannot be the basis for a claim.[2]

      The non-compete provision is section 5 of the SPA. It states:

> 5. Non-Competition. During the Restricted Period, Principal shall not, directly or indirectly, on Principal's own behalf or on behalf of any other Person, except on behalf of HighTower or the Partner Firm in furtherance of Principal's proper duties to HighTower (i) own any interest in, manage, control, participate in, consult with or be or become engaged or involved in any Person engaged in or to engage in the Business within the United States or any other jurisdiction in which HighTower or the Partner Firm does business as of the date of this Agreement and as of the date of each subsequent payment pursuant to the Acquisition Agreement (the "Territory"), including by being or becoming an organizer, owner, co-owner, trustee, promoter, affiliate, investor, lender, partner, joint venturer, stockholder, officer, director, employee, consultant, licensor or advisor of, to or with any Person engaged in or to engage in the Business; or (ii) make any investment (whether equity, debt or other) in, lend or otherwise provide any money or assets to, or provide any guaranty or other financial assistance to any Person engaged in or to engage in the Business in the Territory; provided, however, that nothing in this Section 5 shall prevent Principal from owning, solely as an investment, equity securities of any corporation engaged in the Business which are publicly traded, if Principal (x) is not a controlling person of, or a member of a group which controls, such corporation, (y) does not directly or indirectly own more than two percent (2%) of any class of securities of such corporation, and (z) does not undertake any of the activities contemplated by this Section 5 with respect to such corporation (other than the purchase or ownership of such equity securities) and otherwise has no active participation in the business of such corporation. From and after the date of a valid termination of the Partnership Services and Affiliation Agreement pursuant to Section 12(b)(ii) thereof, the restrictions set forth in this Section 5 shall terminate.

(D.I. 1-1 at 18 of 29). The "Business" is defined in the SPA:

> "Business" shall mean (i) the business of acquiring and/or recruiting investment advisor firms and/or investment advisors or broker personnel; (ii) the business of providing services or products relating to investment management or advice and product or services ancillary thereto; or (iii) any other business that HighTower

---

[2] I interpret the SPA as amended by the 2023 Letter Agreement. Reinig suggests in his reply brief that the Letter Agreement is invalid for lack of consideration. (D.I. 33 at 3). But "[a]rguments raised for the first time before a district court in a reply brief are deemed forfeited." *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 135 (3d Cir. 2023).

conducts or operates or takes material steps toward conducting or operating at any time during the term of the Partner Arrangements.

(D.I. 1-1 at 20 of 29). Taking the two provisions together, the SPA prohibits Reinig from engaging in investment advisory business anywhere in the United States.

The SPA includes a choice of law provision favoring Delaware. (D.I. 1-1 at 23 of 29). Under Delaware law, the parties' choice of law controls unless "application of Delaware law would be contrary to a fundamental policy of a state which has a materially greater interest than Delaware in [the] matter." *Total Holdings USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 882 (Del. Ch. 2009) (quotations omitted). The parties agree that California has a materially greater interest than Delaware in this matter (D.I. 27 at 8; D.I. 32 at 10), so this analysis boils down to determining whether the SPA violates California's public policy. I conclude that it does.

Under California law, non-compete clauses are illegal, absent the application of a specific exception. *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 945 (2008). The governing statute, Cal. Bus. & Prof. Code § 16600, "evinces a settled legislative policy in favor of open competition and employee mobility[,]" and "following the Legislature, [the California Supreme Court] generally condemns noncompetition agreements." *Edwards*, 44 Cal. 4th at 946. The SPA prohibits Reinig from engaging in investment advisory business anywhere in the United States. This clearly violates California public policy.

Hightower argues that the SPA falls under an exception to § 16600. (D.I. 32 at 10). Under Cal. Bus. & Prof. Code § 16601, "Any person who sells the goodwill of a business . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold . . . has been carried on[.]" For a non-compete provision to qualify for the exception in § 16601, however, its geographic scope must be tied to the sold business. *Strategix, Ltd. v. Infocrossing W., Inc.*, 142 Cal. App. 4th 1068, 1071 (2006). Delphi was

5

headquartered in San Diego (D.I. 1 ¶ 58), so restricting Reinig from engaging in investment advisory business throughout the United States is untenable, even under § 16601.

Hightower next claims that the Letter Agreement limits the geographic scope of the SPA. The Letter Agreement states, in relevant part:

> 1. Reinig will not violate the Restrictive Covenants by engaging as a founder, partner, owner, investor, employee or consultant in the field of venture capital and/or private equity as long as such activities are unrelated to retail provision of wealth management, financial planning and investment advisory services.
>
> 2. Reinig will not violate the Restrictive Covenants by soliciting investments from any Person, other than a Person located within 100 miles of San Diego, California, who: (a) was a customer or client of Lourd Capital or Delphi, as of July 11, 2019, or (b) (i) was, during the Restricted Period, a customer or client of Hightower who lists one or more investment adviser representatives of that certain business unit operating under the trade name "LourdMurray" as their investment adviser representative on their account opening documents, and (ii) whom Principal has received Confidential Information regarding, in each case, in connection with the Partner Arrangements.

(D.I. 1-1 at 28 of 29).

These provisions clarify that Reinig's involvement in venture capital and/or private equity would not violate the SPA and that soliciting investments (presumably for venture capital or private equity) is permissible outside San Diego. Hightower argues, "Under the amendments . . ., [Reinig] is permitted to compete with Hightower[.]" (D.I. 32 at 11). Hightower does not correctly analyze the effect of the Letter Agreement. It says nothing about amending the SPA's restrictions against providing investment advisory and wealth management services. (D.I. 1-1 at 28 of 29). In fact, it does not mention the word "compete" at all. (*Id.*). Thus, while its effect is to permit soliciting investments, it does not alter the SPA's prohibition on providing investment advisory and wealth management services. The Letter Agreement does not help Hightower escape § 16600.

The parties argue over other issues, including whether the SPA expired before the period Hightower alleges breach (D.I. 27 at 16; D.I. 32 at 14) and whether issue preclusion settles the issue of the SPA's enforceability. (D.I. 27 at 7; D.I. 32 at 6). Given that California law applies, and that the SPA is clearly unenforceable under Cal. Bus. & Prof. Code § 16600, it is unnecessary to reach these issues.

### B. The Complaint States a Claim for Breach of the Defend Trade Secrets Act.

Reinig moves for a more definite statement from Hightower under Rule 12(e) with respect to Counts II and V—claims for misappropriation of trade secrets under the Defend Trade Secrets Act and conversion of trade secrets, respectively.[3] (D.I. 26 at 2; D.I. 27 at 18–20). Reinig argues, "Hightower has provided no semblance of an adequate description of what its alleged trade secrets and/or 'confidential information' might be." (D.I. 27 at 19).

"Typically, the court restricts the use of [a motion for a more definite statement] to pleadings suffering from unintelligibility rather than the want of detail." *Retzlaff v. Horace Mann Ins.*, 738 F. Supp. 2d 564, 568-69 (D. Del. 2010) (quotations omitted). Here, Hightower's complaint identifies trade secrets such as "client lists, client contact and financial information, [and] proprietary investment strategies." (D.I. 1 ¶ 54). Sounds intelligible to me.[4] "[T]rade secrets

---

[3] The elements of trade secret misappropriation under the DTSA are as follows: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret[.]" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (cleaned up). Reinig only challenges the first element. (D.I. 27 at 18–20).

[4] The DTSA defines "trade secret" as "all forms . . . of financial [or] business . . . information . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known[.]" 18 U.S.C. § 1839(3). Client lists and proprietary investment strategies would seem to qualify. *See, e.g., Liveware Publ'g, Inc. v. Best Software, Inc.*, 252 F. Supp. 2d 74, 85 (D. Del. 2003) (collecting

7

need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets." *Flexible Techs., Inc. v. SharkNinja Operating LLC*, 2019 WL 1417465, at *2 (D. Del. Mar. 29, 2019). Reinig's motion is denied as to these counts.

In conclusion, Counts I, III, IV, and VI are DISMISSED without prejudice. Hightower seeks leave to amend if any of the claims are dismissed. (D.I. 32 at 20). I grant the request. Hightower does not need to file a motion, but the amended complaint must be accompanied by a redlined version showing the changes. Any such amended complaint should be filed no later than February 8, 2025.

IT IS SO ORDERED.

Entered this 24th day of January, 2025

/s/ Richard G. Andrews
United States District Judge

---

cases finding that customer lists are trade secrets); *Waypoint Mgmt. Consulting, LLC v. Krone*, 2022 WL 2528465, at *48–53 (D. Md. July 6, 2022) (denying summary judgment and finding that party's investment strategies could constitute trade secrets under the Maryland Uniform Trade Secrets Act).